```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/30/11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
THE SWATCH GROUP MANAGEMENT
SERVICES LTD.,

        Plaintiff,

  -against-

BLOOMBERG L.P.,

        Defendant.
------------------------------------------------------------- x

**ORDER DENYING MOTION TO DISMISS**

11 Civ. 1006 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

  The motion of defendant Bloomberg L.P. ("Bloomberg") to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is hereby denied.

  On February 8, 2011, The Swatch Group Ltd. ("Swatch Group"),[1] parent company of plaintiff The Swatch Group Management Services Ltd. ("Management Services"), hosted a conference call by telephone from its Bienne, Switzerland, headquarters with a group of securities analysts who had been specifically invited to participate in the call.[2] Second Am. Compl. ¶ 8. Swatch Group's Chief Executive Officer and Chief Financial Officer and three of its other senior executives participated in the call on the company's behalf. Id. ¶ 9. Following the Chief Executive Officer's brief introductory remarks, he and the other senior executives took questions from the invited securities analysts. Id. ¶ 14. In responding to questions, the senior executives talked at length about the company's "worldwide business performance, activities, opportunities and related matters." Id. The call lasted more than two hours. Id.

---

[1] Swatch Group "owns or controls more than two hundred subsidiary entities" through which it "produces and distributes watches for nineteen of the world's best known luxury and broader market watch brands." Second Am. Compl. ¶ 5. In addition, the complaint describes Swatch Group as "the world's leading producer of finished watches, watch parts, movements[,] and components"; "a key player in the manufacture and sale of electronic systems used in watch making and other industries"; and "a leader in the field of sports event timing." Id.

[2] For purposes of this motion to dismiss, I accept as true the factual allegations in the Second Amended Complaint. See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 61 (2d Cir. 2010).

1

Swatch Group had engaged Chorus Call S.A., a Swiss company that provides international audio conferencing services, to set up, transmit, and simultaneously record the conference call. Id. ¶¶ 11–12. An operator informed participants at the beginning of the call that the call would be recorded, and she stated expressly that the call should not otherwise be recorded for publication or broadcast. Id. ¶ 13.

Unbeknownst to Swatch Group, and without invitation, authorization, or consent, Bloomberg tapped into the conference call. Id. ¶¶ 21–22. Bloomberg recorded the call in its entirety and, acting again without the knowledge, authorization, or consent of Swatch Group, created a written transcript from the audio recording. Id. ¶¶ 22–23. Later on February 8, 2011, Bloomberg made both its unauthorized audio recording and transcript of the conference call available online to paid subscribers of its "Bloomberg Professional" newsfeed service. Id. ¶ 24.

Swatch Group assigned all right, title, and interest in and to the United States copyright in the authorized audio recording of the conference call to its subsidiary, Management Services. See id. ¶ 16. Less than one week after the call, Management Services filed suit, alleging copyright infringement. Since this suit was filed, the United States Copyright Office has issued a Certificate of Registration for the authorized audio recording of the call,[3] id. ¶ 18; see also Second Am. Compl. Ex. 1, and Management Services has twice amended its complaint.

Bloomberg now moves to dismiss the Second Amended Complaint.[4] Because the authorized audio recording is entitled to copyright protection, and because the copyright claim is properly registered, I deny the motion in full.

---

[3] The Certificate of Registration expressly acknowledges that "[n]o claim of authorship is made to the performance of speakers not employees for hire of" Swatch Group or Management Services. Second Am. Compl. Ex. 1.

[4] Because Bloomberg's unauthorized transcript is attached to the Second Amended Complaint as an exhibit, see Second Am. Compl. Ex. 2, and because Bloomberg's unauthorized audio recording of the call, submitted in support of its motion to dismiss, is "integral" to the complaint, I may consider both in ruling on the motion to dismiss without converting it to one for summary judgment. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–54.

2

By statute, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). The "work of authorship"[5] at issue here—Swatch Group's audio recording of its conference call—falls into a category of works known as "sound recordings." Id. § 102(a)(7). A "sound recording" is a "work[] that result[s] from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords,[6] in which they are embodied." Id. § 101.

Because the conference call was "transmitted" live to securities analysts whose participation Swatch Group had invited, and because the call was recorded simultaneously with its transmission, Swatch Group's audio recording of the call satisfies the requirement of fixation. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Id. When a "work consist[s] of sounds . . . that are being transmitted"—that is, when a work consists of sounds that are being "communicate[d] . . . by [a] . . . process whereby . . . sounds are received beyond the place from which they are sent," id.— the work is considered

---

[5] As a general matter, under federal law, "[c]opyright in a work . . . vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Under the "work made for hire" doctrine, where "a work is prepared by an employee within the scope of his or her employment," id. § 101, the employer "is considered the author for purposes of" federal copyright law "and, unless the parties have expressly agreed otherwise in a written instrument signed by them," the employer "owns all of the rights comprised in the copyright," id. § 201(b). Because the senior executives who participated in the call were employees of Swatch Group, see Second Am. Compl. ¶ 10, Swatch Group was the author of, and owned the copyright in, the authorized audio recording of the conference call.

[6] The term "phonorecord" is defined broadly to include any "material object[] in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.

3

fixed "if a fixation of the work is being made simultaneously with its transmission." Id. This provision "creates a legal fiction that the simultaneous fixation occurs before the transmission" for purposes of an infringement claim. United States v. Moghadam, 175 F.3d 1269, 1280–81 (11th Cir. 1999). In other words, the law treats the unauthorized recording of sounds that are transmitted live and recorded simultaneously as an infringement of the copyright in the fixed work (assuming the work otherwise qualifies for protection), notwithstanding that the alleged infringer does not copy the fixed version of the work but rather records the live transmission directly. Id. "It is as if one who was dictating live into a tape recorder were overheard and copied at the moment of dictation. At that moment, the material has become a 'writing,' even if copied simultaneously, rather than a moment later." 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.08[C][2] (Matthew Bender, rev. ed. 2011).

Swatch Group's sound recording also satisfies the requirement of originality to qualify for copyright protection. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). Bloomberg does not challenge the independent creation of Swatch Group's audio recording of its senior executives' extemporaneous commentary on the company's health and future prospects. And Swatch Group's audio recording easily satisfies the relatively low bar for creativity, as "even a slight amount will suffice." Id. Indeed, "[t]he vast majority of works make the grade quite easily, as they possess some creative spark." Id.

Sound recordings do present an added layer of complexity when it comes to assessing creativity. As Congress noted when it amended the Copyright Act in 1976:

> [t]he copyrightable elements in a sound recording will usually, though not always, involve "authorship" both on the part of the performers whose performance is

4

> captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the sound recording. There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recordings of birdcalls, sounds of racing cars, et cetera) where only the record producer's contribution is copyrightable.

H.R. Rep. No. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5669. I need not decide whether the manner in which the conference call was recorded contributes to the sound recording's copyrightability, as there can be no real doubt that the spoken-word contributions of Swatch Group's senior executives possess the requisite creativity to qualify for copyright protection. It is true that Swatch Group's senior executives relied upon unprotected facts and figures in responding to analysts' questions. See Feist, 499 U.S. at 344–45 ("The most fundamental axiom of copyright law is that 'no author may copyright his ideas or the facts he narrates.'" (quoting Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556 (1985))). However, the senior executives did not simply recite facts and figures without context or embellishment; rather, there are protectable, creative elements in the senior executives' "manner of expression, [their] analysis or interpretation of events, the way [they] structure[d] [their] material and marshal[ed] facts, [their] choice of words, and the emphasis [they] g[a]ve[] to particular developments." Wainwright Sec. Inc. v. Wall Street Transcript Corp., 558 F.2d 91, (2d Cir. 1977), abrogated on other grounds by Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010); cf. Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70–71 (2d Cir. 1999) ("The question, then, is not simply whether [defendant] copied from [plaintiff]'s articles, but whether they copied expression original to [plaintiff]." (emphasis added)). At a more basic level, the senior executives' unique pronunciation of words and their inflection and tone of voice, taken together, constitute "something irreducible, which is one man's alone," and that "he may

5

copyright"—at least in the form of a sound recording.[7] Bleistein v. Donaldson Lithographing Co., 188 U.S. 129, 250 (1903) (Holmes, J.); see 1 Nimmer & Nimmer, supra, § 2.10[A][2][a] ("The emphasis or the shading of a musical note, the tone of voice, the inflection, the timing of a vocal rendition, musical or spoken, can all be original with the performer.").

Swatch Group alleges that Bloomberg recorded the live transmission of the conference call in its entirety and made the unauthorized audio recording available online to paid subscribers of its "Bloomberg Professional" newsfeed service. Second Am. Compl. ¶¶ 22, 24. Because Swatch Group fixed the call in a tangible medium of expression simultaneously with its transmission, because Swatch Group's sound recording was independently created, and because Swatch Group's senior executives' spoken-word contributions to the sound recording have the requisite creativity, Management Services has sufficiently pleaded a claim of copyright infringement.[8] See 17 U.S.C. §§ 106, 114. The motion to dismiss is denied in this respect.

---

[7] Bloomberg cites several cases for the proposition that "interviews and question-and-answer sessions concerning factual matters are not protectable by copyright," but the facts of each of those cases are distinguishable from the circumstances presented here. In Estate of Hemingway v. Random House, Inc., 244 N.E.2d 250, 253–54 (N.Y. 1968), plaintiffs pursued a claim of common law copyright infringement—not a claim of infringement under federal statutory law—based on defendants' publication of plaintiffs' decedent's oral expression. The court, on a motion for summary judgment, concluded that plaintiffs had not stated a claim of common law copyright infringement because plaintiffs' decedent had implicitly approved the publication of his oral statements. Id. at 255–56. Likewise, in Falwell v. Penthouse International, Ltd., 521 F. Supp. 1204 (W.D. Va. 1981), the plaintiff had pleaded a claim of common law copyright infringement; the plaintiff was ultimately unsuccessful in his efforts to protect oral expression that he had not fixed in any tangible medium of expression, id. at 1207–08. In Taggart v. WMAQ Channel 5 Chicago, No. 00-4205-GPM, 2000 U.S. Dist. LEXIS 19499, at *10–18 (S.D. Ill. Oct. 30, 2000), the court dismissed a pro se prisoner's copyright infringement claim because he had not sought to register his copyright; had not personally fixed, or directed the fixation of, his oral expression in any tangible medium of expression; and had not expressed anything more than unprotected ideas, without the expenditure of sufficient intellectual labor to render the form of their expression protectable. By contrast, here, Swatch Group states a federal copyright infringement claim based on a sufficiently creative work that is fixed in a tangible medium of expression and for which Management Services has obtained registration.

[8] Because Management Services has sufficiently pleaded a copyright infringement claim based on Bloomberg's unauthorized audio recording of the call, I decline to decide, without further briefing from the parties, whether the unauthorized transcript is an infringing derivative work.

6

Bloomberg next contends that the copyright infringement claim fails because Management Services has not alleged that Swatch Group fully complied with the pre-fixation notice requirement of 17 U.S.C. § 411(c). That subsection provides:

> In the case of a work consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission, the copyright owner may, either before or after such fixation takes places, institute an action for infringement . . . if, in accordance with requirements that the Register of Copyrights shall prescribe by regulation, the copyright owner—
> (1) serves notice upon the infringer, not less than 48 hours before such fixation, identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work; and
> (2) makes registration for the work, if required by subsection (a), within three months after its first transmission.

17 U.S.C. § 411(c). As a practical matter, because Swatch Group did not invite Bloomberg to participate in the conference call, but rather Bloomberg accessed the call surreptitiously and without authorization or consent, there is no way Swatch Group could have known to serve notice on Bloomberg forty-eight hours before the call was scheduled to take place.

In any event, a noted authority on federal copyright law has suggested that, even where an infringement action is based on a work that consists of sounds that are fixed for the first time simultaneously with their transmission, compliance with the more conventional registration requirement of 17 U.S.C. § 411(a) suffices, rendering compliance with § 411(c) unnecessary. Cf. id. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."). As that noted authority explains:

> The question arises whether Section 411(c) is mandatory or merely permissive. That is, in the case of a work that is fixed simultaneously with its transmission, if the copyright owner elects not to bring an infringement action until after the work has been fixed and registered, is he nevertheless required to have served . . . notice upon the defendant within the specified number of days prior to fixation as a condition to bringing the action? Read literally, Section 411(c) would seem to require such advance notice, regardless of whether the infringement action is

7

> brought "before or after such fixation" or before or after registration. It seems clear, however, that such a literal reading was not intended. Section 411(c) exists so that "where the infringer has been given advance notice, an injunction could be obtained to prevent the unauthorized use of the material included in the 'live' transmission." Such an injunction, obtained prior to the transmission and therefore prior to the fixation of the work, necessarily envisages an action prior to registration, because registration is not possible without the deposit of copies, and copies cannot exist prior to fixation. In these unusual circumstances, without prior registration, it was thought that an injunction might be obtained only if the defendant has been given advance notice not to engage in the practice that is the subject of the injunction. But, to the extent that plaintiff does not seek an injunction in advance, and instead waits until after the transmission-fixation, then registers the copyright, and only thereafter brings an infringement action, it would seem that he may proceed under the general features of Section 411(a). In those circumstances, no purpose is served by requiring compliance with the difficult advance notice provisions of Section 411(c)—regardless whether the infringing acts occur at the moment of transmission-fixation or at a later time.

2 Nimmer & Nimmer, supra, § 7.16[B][1][b][iii] (footnotes omitted). The United States Copyright Office appears to agree with this assessment. See General Provisions; Works Consisting of Sounds, Images, or Both: Advance Notice of Potential Infringement, 46 Fed. Reg. 28,846, 28,848 (May 29, 1981) (noting that § 411(c) (then codified as § 411(b)) "clearly establishes an alternative procedure to [§ 411(a)] for bringing a suit for copyright infringement").

Bloomberg does not argue that Management Services has not complied with the registration requirement of § 411(a). Indeed, Management Services obtained registration of its copyright claim effective March 2, 2011, before the filing of the Second Amended Complaint. Because Managements Services has complied with the registration requirement of § 411(a), I conclude that compliance with § 411(c) is not necessary and the motion to dismiss is denied.

Finally, Bloomberg contends that it prevails on the basis of "fair use." The Copyright Act provides that "the fair use of a copyrighted work, . . . for purposes such as criticism, comment, [or] news reporting[] . . . is not an infringement of copyright." 17 U.S.C. § 107. "Whether such 'fair use' exists involves a case-by-case determination using four non-

8

exclusive, statutorily provided factors in light of the purposes of copyright." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006). The statutory factors include the "purpose and character" of the challenged use; "the nature of the copyrighted work"; the "amount and substantiality" of the challenged use "in relation to the copyrighted work as a whole"; and "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. At bottom, however, whether a particular use of a copyrighted work constitutes fair use depends on "'whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it.'" Bill Graham Archives, 448 F.3d at 608 (quoting Castle Rock Entm't, Inc. v. Carol Publ'g Group, 150 F.3d 132, 141 (2d Cir. 1998). Whether Bloomberg's use was a "fair use" is not a determination I can make after reviewing only the pleadings. I decline to address such a fact-intensive issue before the parties have had an opportunity for discovery.

Because I deny Bloomberg's motion to dismiss in full, oral argument, scheduled for August 31, 2011, at 4:00 p.m., is hereby cancelled. The parties shall appear before me for an initial case management conference on September 16, 2011, at 10:00 a.m., in Courtroom 14D, to discuss how they intend to proceed in this matter.

The Clerk shall mark the motion (Doc. No. 16) terminated.

SO ORDERED.

Dated: August 30, 2011
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

9